**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAMES DALE,

*Plaintiff*,                                                Case No. 26-CV-6617

v.

**COMPLAINT**

DEPARTMENT OF DEFENSE,

*Defendant*.

Plaintiff James Dale, by and through his attorney, alleges as follows:

**INTRODUCTION**

1.      Plaintiff James Dale brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the Department of Defense to disclose records revealing how it is implementing a Memorandum of Understanding that it signed with Scouting America earlier this year.  The Memorandum conditions the Department's future support of Scouting America on its successful progress toward making policy changes affecting transgender youth and other core aspects of its programs.

2.      In a prior FOIA action, captioned *Dale v. Department of Defense*, No. 26-CV-5367-RA (S.D.N.Y.), Mr. Dale secured the Department's release of the signed Memorandum. The disclosed text revealed sharp discrepancies between Secretary Pete Hegseth's public description of the agreement and the terms actually contained in the document.

3.      The released text further exposed an ongoing, administration-led compliance regime.  The Memorandum conditions future support on whether Scouting America successfully makes "substantial progress" (an undefined term) on so-called "key policy changes" (which also go undefined), places responsibility for demonstrating that progress "entirely" on Scouting

1

America, and imposes a schedule of check-ins to assess compliance every ninety days.  After each assessment, the Department "will determine whether to continue its support."

4.      The current administration likely seeks a victory over Scouting America that extends far beyond the four corners of the Memorandum.  Secretary Hegseth has long demonstrated a fixation with the organization, which he views as a symbol of a bygone era when traditional gender roles were bedrock norms of American political and civic life.  In his 2016 book on masculinity, Hegseth wrote that America depended on "Boy Scout troops" (along with "athletic[s]" and "the military") to teach young men to reject "soft qualities . . . like self-esteem, fairness, gentleness, sensitivity, and tolerance."[1]  And in 2024, after the group changed its name to "Scouting America," Hegseth, then a Fox News host, issued a lengthy on-air condemnation of the decision, declaring it "a tragedy" that the group had "lost what they stand for."[2]

5.      Indeed, Secretary Hegseth has already made clear that he would like Scouting America to go much further than the Memorandum: to roll back its policies on diversity and inclusion, and even to revert to its prior name and its prior rules on membership.  In the Department's video announcement of the Memorandum, he concludes with this thought: "Ideally, I believe the Boy Scouts should go back to being the Boy Scouts, as originally founded, a group that develops boys into men.  Maybe someday."  Pete Hegseth (@SecWar), X (Feb. 27, 2026), https://x.com/SecWar/status/2027369564531818827.

6.      The Department's pressure campaign raises urgent questions.  Who else at the Pentagon is part of this influence campaign?  How far does it extend?  By what means is such influence being exercised?  And, in particular, to what extent is the ongoing compliance check-in

---

[1] Pete Hegseth, In the Arena 42 (2016).
[2] Jamie Frevele, *'This Is a Tragedy!' Fox & Friends Melts Down over Boy Scouts Changing Their Name, Claims 'The Boy Scouts Are Dead,'* Mediaite (May 8, 2024), https://www.mediaite.com/media/tv/this-is-a-tragedy-fox-friends-melts-down-over-boy-scouts-changing-their-name-claims-the-boy-scouts-are-dead.

procedure being used to pressure Scouting America beyond the express terms of the Memorandum?

7.      These questions are of constitutional significance—a fact not lost on Plaintiff. Plaintiff James Dale is the Eagle Scout whose expulsion from the organization for being openly gay led to *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).  In that case, the Supreme Court held that the state ultimately lacked the power to compel Mr. Dale's readmission to the Scouts because the First Amendment protected the group's ability to determine its own membership.

8.      Decades later, the Department's pressure campaign over Scouting America raises an analogous constitutional problem.  Now that Scouting has voluntarily adopted a broad range of inclusive membership policies, the Department appears to be engaged in government "jawboning"—deploying its immense operational, financial, and logistical leverage behind closed doors to compel Scouting America to hew to the current administration's preferred views on gender.  If so, such a course of conduct would likely violate the First Amendment.  *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024).

9.      Only the release of the Department's implementation records can reveal what is occurring behind closed doors.  Because the Memorandum's ninety-day assessment cycle is actively underway—with a pivotal six-month compliance deadline expected in late August 2026—prompt disclosure is essential so that the public, media, and lawmakers can evaluate government actions as they occur.

10.     For a second time, Mr. Dale brings suit against the Department to enforce the public's right to know.

**PARTIES**

11.     Plaintiff James Dale is a citizen of New York and a resident of Manhattan, in the Southern District of New York.  He is the requester of the records at issue in this case.

12.    Mr. Dale is a writer, speaker, and public commentator on issues of LGBTQ rights.

13.    Mr. Dale's connection to Scouting spans nearly five decades.  He joined as a Cub Scout in 1978, earned the rank of Eagle Scout in 1988, and became an assistant scoutmaster in 1989.  In 1990, Mr. Dale was expelled from the organization for being openly gay.  The litigation that ensued culminated in the landmark *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).

14.    Mr. Dale has been a key participant in the public debate that ensued.  His commentary has appeared in national media outlets like the *New York Times*,[3] the *Los Angeles Times*,[4] the *Washington Post*,[5] and *Time*.[6]  He also publishes pieces on his personal website and through a Substack newsletter sent directly to subscribers.  His most recent published writings address the precise federal activities and operational policy shifts at issue in this case.[7]

15.    Mr. Dale seeks the records at issue here strictly in his capacity as a writer and commentator, and he intends to use them to inform the public about the precise nature of the Department's agreement with Scouting America.

---

[3] *See* James Dale, *The Boy Scouts Can Do a Good Turn Finally*, N.Y. Times (May 19, 2017), https://www.nytimes.com/2017/05/19/opinion/the-boy-scouts-can-do-a-good-turn-finally.html; James Dale, *Boy Scouts' Discrimination Is Killing the Organization*, N.Y. Times (July 19, 2012), https://www.nytimes.com/roomfordebate/2012/07/19/why-do-the-boy-scouts-exclude-gays/boy-scouts-discrimination-is-killing-the-organization.

[4] *See* James Dale, *Scouting's Misstep*, L.A. Times (May 22, 2013), https://www.latimes.com/opinion/la-xpm-2013-may-22-la-oe-dale-boy-scouts-20130522-story.html.

[5] *See* James Dale, *Why Did I Challenge the Boy Scouts' Anti-Gay Policy? Because I Am a Loyal Scout*, Wash. Post (Feb. 8, 2013), https://www.washingtonpost.com/opinions/why-did-i-challenge-the-boy-scouts-anti-gay-policy-because-i-am-a-loyal-scout/2013/02/08/346ebab2-7159-11e2-a050-b83a7b35c4b5_story.html.

[6] *See, e.g.*, James Dale, *I Am a Gay Boy Scout: The Policies Remain Wrong*, Time (May 22, 2015), https://time.com/3893394/boy-scouts-policy-remains-wrong/.

[7] *See, e.g.*, James Dale, *SCOTUS Protected the Scouts' Right to Exclude Me—and Their Right to Be Inclusive*, Time (Mar. 26, 2026), https://time.com/article/2026/03/26/scotus-protected-scouts-right-to-exclude-me-and-their-right-to-be-inclusive-/; James Dale, *The Supreme Court Ruling that Hurt Me May Now Protect Trans Youth*, Advocate (July 6, 2026), https://www.advocate.com/opinion/james-dale-pentagon-scouting-lawsuit; James Dale, *He Said, "Over My Dead Body." I'm the Gay Boy Scout Who Finally Went Back*, Prism & Pen (May 28, 2026), https://medium.com/prismnpen/over-my-dead-body-gay-boy-scout-went-back-af347e205bf3.

16.     Defendant, the Department of Defense, is a department of the executive branch of the United States government, 10 U.S.C. § 111(a), and is an "agency" within the meaning of FOIA, 5 U.S.C. § 552(f)(1).[8]  The Department has possession and control of any existing responsive records sought by Mr. Dale.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).

18.     Venue is proper under 5 U.S.C. § 552(a)(4)(B) because Mr. Dale resides in this District.

## FACTS

19.     Scouting America (formerly the Boy Scouts of America) is a national youth organization with roughly a million youth members.

20.     In 1990, Scouting America expelled Mr. Dale, then an Eagle Scout and assistant scoutmaster, because he was openly gay.  The litigation that followed culminated in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), in which the Supreme Court ruled for the Scouts.  After that decision, "corporate and governmental support for the organization . . . slipped markedly."[9]

21.     Since then, Scouting America has adopted a more inclusive approach to its membership policies.  In 2013, it voted to end its ban on openly gay youth members.  In 2015, it

---

[8] Since September 2025, the Department has sometimes gone by the moniker "Department of War," *see* Exec. Order No. 14,347, § 2(e), 90 Fed. Reg. 43,893 (Sept. 5, 2025), including in many of the documents cited in this Complaint.  By federal statute, of course, the agency's formal statutory name remains the "Department of Defense."  *See* 10 U.S.C. § 111(a) ("The Department of Defense is an executive department.").

[9] Kate Zernike, *Scouts' Successful Ban on Gays Is Followed by Loss in Support*, N.Y. Times (Aug. 29, 2000), https://www.nytimes.com/library/national/082900scouts-contribute.html.

lifted its ban on openly gay adult leaders. In 2017, it began accepting transgender youth. And in 2018 and 2019, it expanded membership to include girls.[10]

### The Trump Administration's Fixation with Scouting America

22.     The Department of Defense has a longstanding operational relationship with Scouting America. Its support has included personnel, equipment, access to installations and facilities, and logistical services, including for Scouting's quadrennial National Jamboree.

23.     Both prior to and following the start of the current presidential administration, Scouting has increasingly drawn scrutiny for its decisions to adopt diversity, equity, and inclusion initiatives and to expand its membership beyond male youth.

24.     In 2024, Kevin Roberts—the "architect" of "Project 2025"—wrote in his book on masculinity "that the scout group should be part of a 'long, controlled burn' to demolish 'rot' in the country." Wickman, *Pete Hegseth, No Boy Scout, Reportedly Wants to Put the "Boy" Back in Scouts*, Vanity Fair (Nov. 25, 2025).[11]

25.     Similarly, Pete Hegseth has long cited the Scouts as a symbol of the decline of modern society and of the decline of traditional masculinity. In a 2016 book on masculinity, Hegseth asserted that "[f]rom Boy Scout troops to athletic fields and the military . . . America must forge [its] future citizens" to resist "soft qualities . . . like self-esteem, fairness, gentleness, sensitivity, and tolerance" and lamented that in other spaces, "America's youth are taught, ad nauseum, to 'coexist.'" Pete Hegseth, In the Arena 42 (2016).

26.     In May 2024, as a television host for Fox News, Hegseth issued a lengthy on-air critique of the organization for changing its name to Scouting America and for broadening its

---

[10] *See generally* Scouting America Membership Standards, Scouting America, https://www.scouting.org/about/membership-standards (last visited June 29, 2026).

[11] https://www.vanityfair.com/news/story/pete-hegseth-boy-scouts-scouting-usa-congress.

membership to include girls, declaring: "[F]ive years ago, the Boy Scouts let in girls, which was basically the end of Boy Scouts. . . . [They] have lost what they stand for. . . . This is a tragedy."[12]

27.    By November 2025, these gripes had become the position of the Department of Defense.  An internal Pentagon memorandum reported by NPR in November 2025 lamented that "[t]he organization once endorsed by President Theodore Roosevelt no longer supports the future of American boys."  *See* Graham Smith & Tom Bowman, *U.S. Ready to Cut Support to Scouts, Accusing Them of Attacking 'Boy-Friendly Spaces,'* NPR (Nov. 25, 2025).[13]

28.    That month, it was reported that the Department was preparing to sever its historic, century-long operational relationship with Scouting America because of those policies. *See id.*

29.    In February 2026, the Department and Scouting announced a conditional arrangement for continued federal support.  On February 27, 2026, the Department publicly announced that it had executed a Memorandum of Understanding with Scouting America, under which the government's continued federal logistical, facility, and infrastructure support of Scouting was explicitly conditioned on the successful implementation of specified programmatic changes to its policies.

30.    That same day, in a six-minute video announcement about the Memorandum, Secretary Pete Hegseth declared that Scouting America had agreed to "modify its policy to make clear that membership will be based solely on biological sex at birth and not gender identity," adding that "the application, any application, will have only two sex designations, male and

---

[12] Jamie Frevele, *'This Is a Tragedy!' Fox & Friends Melts Down over Boy Scouts Changing Their Name, Claims 'The Boy Scouts Are Dead,'* Mediaite (May 8, 2024), https://www.mediaite.com/media/tv/this-is-a-tragedy-fox-friends-melts-down-over-boy-scouts-changing-their-name-claims-the-boy-scouts-are-dead.
[13] https://www.npr.org/2025/11/25/nx-s1-5615164/pentagon-scouting-hegseth-cut-ties.

female, and the application must match the applicant's birth certificate."  Pete Hegseth (@SecWar), X (Feb. 27, 2026).[14]

31.    In that same broadcast, Secretary Hegseth announced that the Department would conduct a formal compliance review at the six-month mark (in late August 2026) to decide whether to terminate its relationship.  *Id.*

32.    Scouting America described the arrangement quite differently.  Its own announcement said nothing about membership eligibility, sex designations, or transgender participation, and in a public statement, Scouting's President and Chief Executive Officer, Roger Krone, said: "We have transgender people in our program, and we'll have transgender people in our program going forward."[15]

33.    In the months that followed, neither party to the Memorandum released the text of the agreement, leaving the public, media, and local Scouting councils unable to verify the actual commitments exchanged or the standards governing future federal support decisions.[16]

### *Plaintiff's Prior FOIA Request and Lawsuit*

34.    On March 24, 2026, Plaintiff James Dale submitted a formal FOIA request (Request No. 26-F-1834) seeking disclosure of the text of the Memorandum.  The Department failed to produce the record within the time limits prescribed by law.

---

[14] https://x.com/SecWar/status/2027369564531818827.

[15] Christopher Wiggins, *Scouting America Says Transgender Kids Are Still Welcome After Pete Hegseth Claimed They Weren't*, Advocate (Feb. 28, 2026), https://www.advocate.com/politics/national/scouting-america-transgender-still-welcome; *see also* Ben Finley & Jamie Stengle, *Pentagon and Scouting America Reach Deal to Keep Ties After Hegseth's Anti-DEI Push*, Associated Press (Feb. 27, 2026), https://apnews.com/article/scouting-america-pentagon-military-boy-scouts-14a5fc1521fcd1e51103638f6f504214.

[16] *See, e.g.*, Joe Eskenazi, *On the Eve of Iran War, the "Secretary of War" Fought with the Boy Scouts. He Didn't Win*, Mission Local (Mar. 9, 2026), https://missionlocal.org/2026/03/boy-scouts-pete-hegseth-scouting-america-dei ("San Francisco-area Scouting leaders were told by national leadership that . . . not all the stuff Hegseth said is in [the Memorandum].").

35.    On June 25, 2026, Mr. Dale filed suit in this District to compel production of the Memorandum, in a case captioned *Dale v. Department of Defense*, No. 26-CV-5367-RA (S.D.N.Y.).

36.    That same day, the Pentagon's acting press secretary declined the *New York Times*'s request for a copy of the Memorandum, on the ground that "this is now a matter of active litigation."  Helene Cooper, *Complaint Seeks Disclosure of Pentagon's Agreement with Scouting America*, N.Y. Times (June 25, 2026).[17]

37.    On July 16, 2026, the Department voluntarily produced a copy of the final, six-page, executed Memorandum of Understanding to Mr. Dale, disclosing its written terms in full to the public for the first time.  (A copy of the Memorandum is attached as Exhibit A.)

38.    The released Memorandum establishes that federal support for Scouting America is conditional rather than fixed, providing:

> This support is contingent upon Scouting America making substantial progress on key policy changes, subject to review every 90 days, following execution of this MOU to determine the continuation of the partnership.

39.    The Memorandum then specifies discrete programmatic commitments required of Scouting.  Among other things, it requires Scouting to replace specified organizational language, to discontinue the Citizenship in Society merit badge, to waive registration fees for military families, and to create a Military Service merit badge.

40.    With respect to membership, the Memorandum provides:

> Scouting America will amend its policy to affirm that participation is based on and aligned with biological sex at birth.  Accordingly, Scouting America membership applications will continue to only provide "male" and "female" as sex designations.

---

[17] https://www.nytimes.com/2026/06/25/us/politics/pentagon-scouting-america-lawsuit.html.

41.     The text of the Memorandum does not appear to mandate several of the policy changes Secretary Hegseth publicly announced on February 27, 2026.  It contains no provision barring transgender youth or adult leaders from belonging to the organization.  And it nowhere states that the sex designation on applications from new youth members must match the applicant's birth certificate.  The Department's production of the Memorandum thus reveals a fundamental discrepancy between the Secretary's public description and the written instrument.

42.     The Memorandum also establishes an ongoing, agency-directed compliance process, requiring the parties to meet every ninety days or so to assess Scouting's continued adherence to the agreement.  After each meeting, the Department will decide whether federal support for Scouting will continue.

43.     Under this ongoing compliance regime, Scouting America has made striking operational concessions that, as is now clear in the wake of the disclosure of the Memorandum, go far beyond any of its express terms.  Consider the 2026 National Scout Jamboree.  At the previous National Jamboree in 2023, Scouting America featured its first-ever dedicated "Community Spaces"—affinity areas specifically created for LGBTQ+ youth, scouts of color, and female participants.  Until recently, Scouting America had planned to maintain these same inclusion spaces at the July 2026 Jamboree.[18]

44.     On April 3, 2026, it was reported that Scouting America had quietly scrapped all plans for Community Spaces as part of its ongoing dispute with Secretary Hegseth.  One Scouting employee stated that event organizers were overruled by management: "It was not my decision (or the Jamboree leadership's decision) to cancel, it came from the national office."

---

[18] *See* Scouting America, 2026 Jamboree Staff Job Catalog at 15–16 (Feb. 19, 2025).

Mike De Socio, *Scouting America Cancels LGBTQ+ Inclusion Space Planned for Summer Jamboree*, Morally Straight (Apr. 3, 2026).[19]

45.     Because of Scouting's volte-face, "thousands of young people" were suddenly denied a dedicated safe space or equivalent resources at this year's Jamboree.  *See id.* (quoting one Eagle Scout's view that the organization was "kind of walking back on its values that they told me they believed in"); *id.* ("It was at a community tent that Layla Grace found the first place where she could talk openly about being a transgender female.").  And there has been no explanation why.

46.     When asked to comment on the cancellations, Scouting America issued an evasive response, stating only that it "continuously makes programmatic updates in our advancement, structure, activities and events."  Scouting "did not address questions about the changes to the jamboree."  Jamie Stengle, *Scouting America Drops Diversity Initiatives from Event After Pressure from the Pentagon*, AP News (July 30, 2026).[20]

47.     When asked to comment on the "implementation and monitoring of the deal," the Pentagon similarly demurred, "referr[ing] to previous comments by Hegseth."  *Id.*

48.     The text of the Memorandum—which contains no provision compelling the elimination of Jamboree affinity spaces—cannot explain Scouting America's decision.

49.     These cancellations hint at the potential coercive impact of the Department's recurring ninety-day review cycle.  Facing the ongoing threat that federal support will be cut off if the Department decides Scouting America has failed to demonstrate "substantial progress," it

---

[19] https://morally-straight.ghost.io/scouting-america-cancels-lgbtq-inclusion-space-2026-jamboree.
[20] https://apnews.com/article/scouting-america-national-jamboree-inclusion-hegseth-e510d8e7c848774baae1612c976ecb6d.

seems plausible that the organization's national leadership is agreeing to do more than the Memorandum's plain terms indicate.

50.     This raises the direct specter of government "jawboning."  Disclosure of the Department's implementation records is therefore necessary to see what the Department might be requiring of Scouting America behind closed doors.

51.     The urgency of disclosure is heightened by the timing of the Department's next major review of Scouting's compliance.  In February, Secretary Hegseth announced that Department support is "contingent on" Scouting America making "substantial progress" toward the MOU's terms, and that the Department would "vigorously review progress" after six months and decide whether to continue support.  Six months from the date of execution of the Memorandum falls on or about August 27, 2026.

### *Plaintiff's Current FOIA Request*

52.     On June 26, 2026, Plaintiff James Dale submitted a second FOIA request, this time seeking the Department's implementation and compliance records.  (A copy of the request is attached as Exhibit B.)

53.     Mr. Dale submitted this request through the federal FOIA.gov portal (Submission ID 2994171) to the Department's Office of the Secretary of War and Joint Staff FOIA Requester Service Center, which assigned it Request No. 26-F-2630.

54.     In summary, this current FOIA request covers five discrete categories of records, from January 20, 2025, through the date of the search:

> (1)     Scouting America's compliance submissions, certifications, and progress reports under the Memorandum;
>
> (2)     The Department's implementation criteria, monitoring rubrics, and review evaluations, including any definition of "substantial progress" and any criteria still in development;

(3)     Internal public-affairs guidance and communications with members or committees of Congress regarding the Memorandum;

(4)     Records reflecting the nature and value of federal support provided or conditioned on Scouting's compliance, including support for the July 2026 National Scout Jamboree; and

(5)     Records reflecting decisions or legal rationales for treating the Memorandum and its implementation files as nonpublic.

55.     To minimize administrative processing burdens without delaying production, the request indicated openness to rolling production, prioritization of headquarters-level records, sampling, and a meeting to narrow custodians, date ranges, or search terms, if necessary.

56.     Contemporaneously with his request, Mr. Dale submitted a certified application for expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 32 C.F.R. § 286.8(e), demonstrating that he is a person "primarily engaged in disseminating information" and that there was an "urgency to inform the public concerning actual or alleged Federal Government activity."  To demonstrate the latter, Mr. Dale cited sustained national news coverage, written congressional inquiries, directly contradictory public accounts by the signatories, and implementation steps already underway on the ground.

57.     In particular, to show concrete urgency, Mr. Dale identified two concrete endpoints tied to the government activity: (1) the July 22–31 National Scout Jamboree, at which Department support was expected to be deployed, and (2) the Department's announced six-month review and support decision, expected around August 27, 2026.

58.     On June 30, 2026, the Department issued an interim response acknowledging that it had received the request on June 29, 2026.  (A copy of this interim response is attached as Exhibit C.)  The Department's response invoked the "unusual circumstances" provision under 5 U.S.C. § 552(a)(6)(B), but failed to specify which statutory scenario applied.  Instead, it listed all three statutory categories and stated only that "[a]t least one, if not more" of the three categories

13

"applies or would likely apply."  It also failed to provide an expected determination date or processing-completion date, as required by 5 U.S.C. § 552(a)(6)(B)(i) and 32 C.F.R. § 286.8(c). Instead, it stated that the Department was "unable to estimate the potential volume of records or the number of consultations" until searches were complete.

59.    In the same interim response, the Department denied Plaintiff's application for expedited processing, on the asserted ground that Plaintiff had "not clearly demonstrated how the information will lose its value if not processed on an expedited basis."

60.    As of August 3, 2026, the Department has not processed Mr. Dale's request on an expedited basis, made any determination, or produced any responsive records.

## COUNT I
### (Violation of FOIA, 5 U.S.C. § 552(a)(3), (a)(4)(B), (a)(6)—
### Improper Withholding of Agency Records)

61.    Mr. Dale incorporates the foregoing allegations.

62.    Request No. 26-F-2630 reasonably describes agency records subject to FOIA.  To the extent those records exist, the Department possesses or controls them.

63.    Under 5 U.S.C. § 552(a)(6)(A)(i), the Department had twenty working days after receiving the request to determine whether it would comply and to notify Mr. Dale immediately of that determination and its reasons.  The Department was also required to make nonexempt responsive records promptly available under 5 U.S.C. § 552(a)(3)(A).  It did neither.

64.    When an agency invokes the "unusual circumstances" exception, its written notice must state those unusual circumstances and "the date on which a determination is expected to be dispatched."  5 U.S.C. § 552(a)(6)(B)(i); *see also* 32 C.F.R. § 286.8(c).

65.    The Department's June 30 notice did not identify any particular unusual circumstances and gave no expected determination date.  Instead, the Department said that it was

14

"unable to estimate" the scope of the work required.  The notice therefore did not validly invoke the "unusual circumstances" exception and did not extend the statutory period for responding.

66.     The twenty-working-day period, measured from the Department's asserted receipt date of June 29, elapsed on July 28, 2026.  During that period, the Department issued no determination and produced no responsive record.

67.     Mr. Dale is therefore deemed to have exhausted his administrative remedies.  *See* 5 U.S.C. § 552(a)(6)(C)(i).

68.     The Department has failed to conduct a search reasonably calculated to uncover all responsive agency records.

69.     The Department is improperly withholding nonexempt agency records responsive to Mr. Dale's FOIA request.  If the Department contends that any part of a responsive record is exempt, FOIA still requires the release of all reasonably segregable nonexempt portions.  *See* 5 U.S.C. § 552(b).

70.     FOIA requires the Department to make responsive, nonexempt records promptly available, *see* 5 U.S.C. § 552(a)(3)(A), and authorizes this Court to order their production, *id.* § 552(a)(4)(B).  Because of the time-sensitive nature of this request, Mr. Dale asks the Court to set a date-certain production schedule.

### COUNT II
**(Violation of FOIA, 5 U.S.C. § 552(a)(6)(E)—**
**Unlawful Denial of Expedited Processing)**

71.     Mr. Dale incorporates the foregoing allegations.

72.     FOIA requires expedited processing when a requester demonstrates a compelling need.  One statutory form of compelling need is an "urgency to inform the public concerning actual or alleged Federal Government activity" shown by "a person primarily engaged in

15

disseminating information."  5 U.S.C. § 552(a)(6)(E)(i), (v)(II).  The Department's regulations impose the same requirement.  32 C.F.R. § 286.8(e).

73.    In his application for expedited processing, Mr. Dale explained that researching, authoring, and delivering public commentary is his principal professional output, identified relevant publications, and described his intended dissemination of the responsive records.

74.    In the application, Mr. Dale also established an urgent need for disclosure.  The submission identified two looming event dates that made the requested information particularly time-sensitive: first, the Department's congressionally authorized support would be deployed at the National Scout Jamboree from July 22 to July 31, 2026; second, the Department had announced a review and support decision expected around August 27, 2026.

75.    The certification explained that delay beyond those endpoints would diminish the records' contemporaneous public value by preventing scrutiny while Department support was being deployed and before the Department decided whether to continue it.

76.    The Department denied expedited processing on the ground that Mr. Dale had "not clearly demonstrated how the information will lose its value if not processed on an expedited basis."  The denial did not further explain the Department's reasoning.

77.    The denial of expedited processing is agency action subject to judicial review on the record before the agency.  *See* 5 U.S.C. § 552(a)(6)(E)(iii)–(iv).

78.    The Department's denial was unlawful.  Mr. Dale is entitled to an order requiring the Department to process his request "as soon as practicable."  5 U.S.C. § 552(a)(6)(E)(iii); *see also* 32 C.F.R. § 286.8(e)(4).

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Dale respectfully requests that this Court:

A.    Declare that the Department violated FOIA by failing to make a timely determination on his records request and by continuing to withhold nonexempt responsive records, and order the Department promptly to conduct a search reasonably calculated to locate all responsive records;

B.    Order the Department to disclose promptly all responsive nonexempt records and all reasonably segregable nonexempt portions of responsive records, on a firm rolling-production schedule with a date certain for initial production early enough to permit meaningful public review before the late-August review and support decision;

C.    Review any decision to redact or withhold responsive information and require the Department to justify each withholding with sufficient specificity;

D.    Declare that the Department unlawfully denied expedited processing and order the Department to process his FOIA request as soon as practicable;

E.    Award Mr. Dale his reasonable attorney's fees and other litigation costs reasonably incurred in this action, 5 U.S.C. § 552(a)(4)(E); and

F.    Grant such other and further relief as the Court may deem just and proper.


Dated:  August 3, 2026                               Respectfully submitted,

                                                    /s/ Isaac Park
                                            Isaac Park (NY Bar No. 5708482)
                                            Law Offices of Isaac Park, PLLC
                                            767 Broadway #1752
                                            New York, NY 10003
                                            Phone: (646) 402-5902
                                            isaac@parklaw.org

                                            *Counsel for Plaintiff*

17